**Thomas G. DUNN, Appellant,**

v.

**GANNETT NEW YORK NEWSPAPERS, INC.**

**No. 87–5165.**

United States Court of Appeals, Third Circuit.

Argued Sept. 28, 1987.

Decided Nov. 10, 1987.

As Amended Nov. 20, 1987.

William J. Prout, Jr. (argued), Janyce W. Stahl, Tompkins, McGuire & Wachenfeld, Newark, N.J., for appellant.

Robert C. Bernius (argued), Richard D. Rochford, Jr., Nixon, Hargrave, Devans & Doyle, Washington, D.C., Richard A. Ragsdale, Strauss & Hall, Princeton, N.J., for appellee.

Before GIBBONS, Chief Judge, MANSMANN and ALDISERT, Circuit Judges.

### OPINION OF THE COURT

ALDISERT, Circuit Judge.

We are faced with a novel question of defamation law in this diversity proceeding. We must decide whether the attribution by a newspaper of the Spanish word "cerdos" to an utterance of the Elizabeth, New Jersey, mayor describing city litterbugs constitutes actionable libel under state law and the teachings of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. An acceptable English translation of "cerdos" is "pigs." We are required to determine whether the actual Spanish word or its English translation should be considered in

deciding whether actual malice was implicated in the publication.

*El Diario–La Prensa,* a Spanish language daily newspaper, published an account of Mayor Thomas G. Dunn's anti-litterbug remarks made during a campaign speech. The headline introducing the story stated that the mayor had called Elizabeth's Hispanic population "cerdos"; the paper later published a very critical open letter to the mayor. The mayor then filed a complaint against the newspaper charging it with libel. The paper interposed a *New York Times* defense in a summary judgment proceeding contending that the mayor had failed to present sufficient evidence of actual malice. The district court agreed. The mayor has appealed. We first turn to the facts which are largely undisputed.

### I.

On October 19, 1984, the Mayor of Elizabeth, New Jersey, Thomas G. Dunn, made certain comments during a campaign debate in response to a question regarding the City's litter problem:

> But litter, of course, is an ever growing problem because we are a very busy, a growing city. And you know our public work employees do not go around deliberately filling the curbs up with debris. People, people make debris. And we're constantly trying to educate people to the fact that if they want a clean downtown they're going to have to do their part to keep it clean. You have a lot of new people moving into the City of Elizabeth, some coming from foreign lands where abject poverty was something they lived with everyday and they have not yet been assimilated into our type of society, and it will take a great deal of time for some of them to respect the rights and the properties of other people, and above all, to respect a city that offers them a home in what I consider to be a wholesome environment.

On October 23, 1984, *El Diario–La Prensa,* a newspaper that publishes in Spanish and serves the Hispanic communities in the New York metropolitan area, carried the following lead headline:

> Alcalde de Elizabeth al ataque:
> LLAMA 'CERDOS' A LOS HISPANOS
> Antes prohibio hablar espanol pag. 3

Translated into English [1], the headline read:

> Elizabeth Mayor on the attack:
> CALLS HISPANICS 'PIGS,'
> Had previously prohibited the speaking of Spanish pag. 3

"Pigs" is an English translation of "cerdos," the Spanish word used in the headline. The story on page three described the mayor's comments in detail. In this appeal, Dunn does not dispute the accuracy of the story, but contends that the headline was defamatory.

After the "cerdos" article was published, an assistant editor of *El Diario* attempted to reach Mayor Dunn for his comment. He was unsuccessful. It was alleged that a city official told the editor that city employees were not permitted to talk with *El Diario* representatives. Subsequently, on October 28, 1984, *El Diario* published an open letter to Mayor Dunn written by Manuel de Dios Unanue, the paper's Editor-in-Chief. Dunn also claims that parts of this open letter were defamatory.

In his complaint against Gannett New York Newspapers, Inc., the publisher of *El Diario,* Dunn claimed that the October 23rd headline and October 28th open letter were defamatory. Sitting under diversity jurisdiction, the district court applied New Jersey law to the case. On May 1, 1986, the court denied defendant's motion for summary judgment dismissing the action as to the October 23rd headline, but granted its summary judgment motion as to the October 28th open letter.

Gannett successfully moved for re-argument and, on September 16, 1986, the court vacated that portion of its earlier ruling

---

**1.** The defendant, without objection from the plaintiff, provided the district court with translations of the headline and open letter noted in this opinion. The translations are not contested in this appeal.

dealing with the October 23rd headline. It then granted defendant summary judgment as to the headline, holding that the plaintiff had failed to present clear and convincing evidence that the newspaper published the headline with actual malice. The district court reiterated this holding in January 1987 when it denied plaintiff's motion for reconsideration. The court also denied Dunn's request to supplement the record. Dunn appeals from the district court's grants of summary judgment and from the court's denial of his record-supplementing motion.

## II.

Applicable summary judgment precepts are familiar. Summary judgment can be granted only if no genuine issue of material fact exists. Rule 56(c), F.R.Civ.P.; *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). An issue is "genuine" only if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.*, 106 S.Ct. at 2510. On review, this court applies the same test that the district court should have adopted. *Marek v. Marpan Two, Inc.*, 817 F.2d 242, 244 (3d Cir.1987). We now proceed to examine the applicable legal precepts that govern publication of *El Diario's* October 23rd headline.

## III.

Dunn contends that he has produced sufficient evidence to create a genuine issue as to the states of mind of the newspaper's editors at the time of publication of the October 23rd "cerdos" headline. These states of mind are very relevant to the first amendment's concept of actual malice.

Dunn's argument requires us to pursue both state and federal law inquiries. We must determine (1) whether the defendant has harmed the plaintiff's reputation within the meaning of state law; and (2) if so, whether the interposition of the first amendment precludes recovery. *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1077 (3d Cir.), *cert. denied*, 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985); *Steaks Unltd., Inc. v. Deaner*, 623 F.2d 264, 270 (3d Cir.1980). In this diversity case, our first determination, then, must be whether Dunn has made out a proper claim under New Jersey law. *See Jenkins v. Westinghouse Broadcasting & Cable, Inc.*, 829 F.2d 403 (3d Cir.1987).

### A.

Those who write or publish material that tends to injure an individual's reputation may be subject to liability under New Jersey law in a libel action if the material is false. *Maressa v. New Jersey Monthly*, 89 N.J. 176, 445 A.2d 376, 383–84, *cert. denied*, 459 U.S. 907 (1982); *see Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 N.J. 552, 117 A.2d 889, 891 (1955). For a libel action to qualify, the disputed statement must be an assertion of fact. *Karnell v. Campbell*, 206 N.J.Super. 81, 501 A.2d 1029, 1033 (1985). The issue then becomes whether the language used is reasonably susceptible of a defamatory meaning. *Kotlikoff v. The Community News*, 89 N.J. 62, 444 A.2d 1086, 1088 (1982).

It is the function of the court, and not the factfinder, to decide if the contested statement is defamatory on its face. *Lawrence v. Bauer Pub. & Printing, Ltd.*, 89 N.J. 451, 446 A.2d 469, 473, *cert. denied*, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982). Words that subject a person to ridicule, hatred, or contempt or which "clearly 'sound to the disreputation' of an individual," are defamatory on their face. *Id.* If the language at issue is capable of both a defamatory and a nondefamatory meaning, there exists a question of fact for the jury to decide. *Id.*

Here, the district court determined that "the headline, inasmuch as it proclaims that the plaintiff called Hispanics dirty persons, could be, in the view of some jurors,

actionable given what plaintiff actually said." App. at 190. The court, however, granted defendant's motions for summary judgment, concluding that plaintiff did not produce clear and convincing evidence of actual malice. For our purposes, we assume that the October 23rd headline is defamatory under New Jersey law, but agree with the district court that Dunn has not surmounted the formidable first amendment barriers to recovery.

### B.

A brief digest of first amendment strictures on the law of defamation, also very familiar, is in order. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964), the Court recognized that "debate on public issues should be uninhibited, robust, and wide open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." To give effect to this precept, the Court held that proper fealty to the first amendment commands that a public official may not recover for defamatory falsehood relating to his official conduct unless he proves with "convincing clarity" that the statement was made with "actual malice": "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 285–86, 84 S.Ct. at 725–26, 728–29, *see Dickey v. CBS Inc.*, 583 F.2d 1221, 1227 (3d Cir.1978). Reckless disregard means "the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *see Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1965, 80 L.Ed. 2d 502 (1984) (clear and convincing evidence that defendant "realized the inaccuracy at the time of publication"); *Coughlin v. Westinghouse Broadcasting & Cable Inc.*, 780 F.2d 340, 342 (3d Cir.1985), *cert. denied*, 476 U.S. 1187, 106 S.Ct. 2927, 91 L.Ed.2d 554 (1986). Hence, the importance of considering the editors' states of mind at the time of publication.

We have recently received assistance from the Court in dealing with actual malice in a summary judgment context. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court dealt with this precise issue. "[W]here the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Id.*, 106 S.Ct. at 2512. When a litigant presents an actual malice issue on appeal, the Court "has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose*, 466 U.S. at 499, 104 S.Ct. at 1958 (quoting *New York Times*, 376 U.S. at 284–86, 84 S.Ct. at 728–29).

### IV.

In the case at bar, the district court determined that because *El Diario*'s comments dealt with the official conduct of a public official, the rule of *New York Times* applied to Mayor Dunn's libel action. This threshold determination is not, and cannot be, seriously refuted. The district court concluded, however, that Dunn failed to raise a genuine issue as to whether *El Diario*'s editors published the October 23rd headline with actual malice. We must initially determine whether a genuine issue of fact was presented relating to the headline's publication.

The mayor contends that he has produced sufficient evidence to create a genuine issue as to the editors' states of mind at the time of publication. Specifically, Dunn compares what he actually said with what the editors said he said in the headline. He argues that *El Diario*, by enclosing 'cerdos' in single quotation marks, purported to proclaim that the mayor had in fact used the word "pigs" in discussing the litter problem. Dunn refers also to deposition testimony by Antonio Santurio, an assist-

ant metropolitan editor for *El Diario*, who stated that he knew at the time the headline was published that Dunn had neither referred to Hispanics in particular nor used the word "pig." The district court commented that "[e]ssentially, plaintiff argues that because defendant knew that the headline was an exaggeration of the truth, actual malice may be implied." App. at 290.

Jose Rohaidy, an *El Diario* journalist, wrote the newspaper story that accompanied the allegedly defamatory headline. He based it on telephone conversations with Manual Goberna and Juan Sierra. Rohaidy did not attend the campaign debate that prompted the mayor's remarks, but Goberna and Sierra were present. By affidavit, Goberna stated that he understood Dunn's remarks to refer to Hispanics. *Id.* at 141. "Dunn did not use the word 'pigs' in the debate, but the effect was the same, as far as I and others with whom I spoke were concerned, as if he had called [Hispanics] pigs outright." *Id.* at 143. Sierra's affidavit stated that he also believed that the mayor's remarks referred to Hispanics, and that the article correctly reflected the frustration and anger felt by the Hispanic community over Dunn's accusations that the latest immigrants were responsible for the filth in the City. *Id.* at 137. Another person present at the debate also understood the mayor's remarks to refer to Hispanics. *See* affidavit of Otoniel Palacio, app. at 150.

Editor Santurio explained by affidavit that the editorial staff of the newspaper held a meeting to decide how, in headline form, to express the gist of Dunn's remarks. Santurio explained that the paper faced a problem, because there are no exact Spanish words for litter, litterbug, or litterpig. *See also* affidavit of Manuel Nazario, app. at 130 (no Spanish term equivalent to the English term litterer). According to Santurio, the editors chose to use "cerdos" in the headline only after they decided that alternative words were "inappropriate," "too strong, too vulgar [or] too inflammatory." [2] *Id.* at 98–99. In his words:

> The headline we agreed on stated that the Mayor had called Hispanics "cerdos." Mayor Dunn had not used the word "pig," the literal English translation of "cerdo," in his remarks. However, when properly interpreted, and after considering all of the subtleties of the Spanish language, the Mayor had called Hispanics "cerdos," as the word is used in the Spanish language to refer to those who dirty the street by littering.

*Id.* at 99; *see also* affidavit of Manuel Nazario, app. at 131 ("cerdos" an appropriate and linguistically correct means of conveying in Spanish that someone is a litterer or dirtier of streets). Furthermore, Santurio noted that the newspaper placed quotation marks around "cerdos" "to indicate that the word was being used in a figurative sense." App. at 99; *see also* affidavit of Manuel Nazario, app. at 131 (use of quotation marks in Spanish does not necessarily signify that a literal quotation is intended). Santurio believed that the headline paraphrased the gist of the mayor's remarks; it "was not intended to convey, nor do I believe that our Spanish-speaking readership interpreted it to convey, that Dunn was being directly quoted." *Id.* at 99. The foregoing constitutes the basic evidence presented in the summary judgment proceedings, or what reasonably could have been expected at a trial.

## V.

This evidence persuasively shows that *El Diario* based its October 23rd headline and accompanying article on numerous sources who felt that the mayor's remarks referred to Hispanics. Mayor Dunn has offered no evidence that demonstrates that *El Diario* doubted the accuracy or impressions of its sources. He has not presented any evi-

---

**2.** The editors considered these alternative words in formulating the headline: sucio, marrano, puerco, and cochino. App. at 98–99. Collins Spanish–English English–Spanish Dictionary defines sucio as vile, mean, despicable, filthy, dirty, or obscene; marrano as swine, filthy, dirty, or pig; puerco as pig, swine, or rotter; and cochino as pig, swine, hog, or filthy person. C. Smith, *Collins Spanish–English English–Spanish Dictionary* (1971). The dictionary defines cerdo as pig, dirty person, or slovenly person. *Id.*

dence to contradict the editors' choice of words in the Spanish language; he has presented no evidence to challenge that "cerdos" most accurately reflects in Spanish the essence of Dunn's statements about the litter problem. Rather than offering evidence on the word "cerdos," Dunn simply translates the word into English, seizes one of the meanings, "pigs," and on this one English meaning, anchors his basic contention that the Spanish word is inappropriate. His strongest argument is that there is a vast difference between the English words he did say, and an English translation of a Spanish word that described what he said.

■ We are not willing to base an actual malice determination solely on the translation to English from Spanish of the language used by the defendant. We have decided that the *New York Times* standard must be applied to the actual words used by the defendant, *see Jenkins v. Westinghouse Broadcasting & Cable, Inc.,* 829 F.2d 403, 406–07 (3d Cir.1987). If the language is Spanish, we must apply the standard to Spanish. We proceed in this manner because we believe that a translation may not always reflect the nuances and subtleties of the original language. This is especially true in the present case, because it is not controverted that there is no exact Spanish word for litterer or litterbug.

■ At most, Dunn's evidence shows that the newspaper mischaracterized the mayor's remarks. However, this error is not enough to hold the paper liable for defamation under the *New York Times* actual malice standard. *See Bose Corp.,* 466 U.S. at 512–13, 104 S.Ct. at 1965–66 (language in article reflecting a misconception by author not enough to prove actual malice because language chosen was "one of a number of possible rational interpretations" of an event "that bristled with ambiguities"); *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (Time Magazine's interpretation of a document, though arguably reflecting a misconception, was not enough to create a jury issue of actual malice). More realistically, the headline was a rational interpretation

of remarks that bristled with ambiguities. As the district court noted, a headline may not meet one's expectations of a responsible press.

Because we believe that the word "cerdos" must be evaluated in its unaltered Spanish version, and because we are convinced that the word was a fair, albeit inadequate, translation of the relatively new additions to the American vocabulary of the words "litter," "litterer," or "litterbug," it was critical to the plaintiff's case that he meet this reality with countervailing factual evidence of actual malice. This he failed to do. In failing, he created no genuine issue of material fact. We hold that the district court did not err in granting summary judgment to defendant on that portion of the defamation action relating to the October 23rd headline.

## VI.

■ We turn next to the October 28th open letter written by the Editor-in-Chief of *El Diario,* Manuel de Dios Unanue. The district court noted that the open letter "may justly be characterized as an expression of opinion." App. at 195. Determining that all facts relating to the editor's statements were contained in the letter, the district court concluded that the letter was not actionable as libel.

On appeal, Dunn argues that because statements in the letter were impliedly based on the existence of undisclosed defamatory facts, the letter was actionable. In particular, Dunn asserts that the open letter implied that he was guilty of obstruction of justice in covering up wrongdoing and embezzlement within City government. Dunn also argues that the letter charged him with denying the free speech rights of municipal employees. He contends that both charges are without basis in fact.

### A.

Mindful of our earlier description of the nature of defamation, we again refer to state law in evaluating appellant's contentions. New Jersey has adopted the *Restatement (Second) of Torts* § 566 (1977)

to determine whether an opinion is actionable as defamation. *See Kotlikoff v. The Community News*, 89 N.J. 62, 444 A.2d 1086, 1089 (1982); *Karnell v. Campbell*, 206 N.J.Super. 81, 501 A.2d 1029, 1033 (1985). Section 566 provides:

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

The principle making expressions of pure opinion non-actionable is grounded on the first amendment precept that ideas themselves cannot be false. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974). Thus, insofar as protections for statements of opinion are concerned, New Jersey substantive law and federal constitutional law are intertwined. Many New Jersey cases are cast in first amendment terms when courts have had to decide whether a statement may be characterized as opinion. *See Dairy Stores, Inc. v. Sentinel Pub. Co.*, 104 N.J. 125, 516 A.2d 220, 235 (1986); *Canino v. New York News, Inc.*, 96 N.J. 189, 475 A.2d 528, 532 (1984); *Maressa v. New Jersey Monthly*, 89 N.J. 176, 445 A.2d 376, 387, *cert. denied*, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982); *Kotlikoff*, 444 A.2d at 1089.

Comments to section 566 of the Restatement expand upon the distinction between protected and unprotected expressions of opinion. Several gradations of what constitutes "opinion" are set forth.

"Pure" opinion occurs, according to Comment b, when the maker of the remark states the facts on which he bases his opinion of the plaintiff and then expresses a view as to the plaintiff's conduct, qualifications, or character. "Pure" expression of opinion occurs also when the maker of the statement does not spell out the alleged facts on which the opinion is based, but both parties to the communication know the facts or assume their existence. Under these circumstances, the statement of opinion is obviously based on those assumed facts as justification for the opinion. Under New Jersey law, "[e]xpressions of 'pure' opinion on matters of public concern may no longer be the basis of an action for defamation." *Kotlikoff*, 444 A.2d at 1089–90.

A second, or "mixed," type of opinion is an expression based on facts relating to the plaintiff, or his conduct, that have neither been stated by the defendant nor assumed to exist by the parties to the communication. As the Restatement notes, if these undisclosed facts are defamatory, the defendant's statements are actionable. *Restatement (Second) of Torts* § 566 comment b (1977). Thus, the predicate facts are controlling. If these facts are themselves defamatory, an opinion based on them is beyond the pale of protection under state law.

In predicting what the New Jersey Supreme Court would do, we have decided that the Restatement format is the appropriate route to follow here. We must decide whether the October 28th letter was based on undisclosed false or defamatory statements of fact, or whether it simply expressed protected statements of pure opinion. *Kotlikoff*, 444 A.2d at 1090. In making this determination, we must consider the letter in its totality, examining all the words used, along with the letter's context and circumstances. *Id.* at 1091; *see Karnell v. Campbell*, 206 N.J.Super. 81, 501 A.2d 1029, 1032–33 (1985); *Molnar v. Star–Ledger*, 193 N.J.Super. 12, 471 A.2d 1209, 1212 (1984).

### B.

As translated, the October 28 open letter began:

> Again Mr. Mayor? In all of my career as a newspaperman, I have never encountered a politician who has committed so many mistakes and demonstrated such little sensitivity toward the people he supposedly represents.

App. at 122. The paragraphs of the letter that allegedly charged the mayor with embezzlement, covering up wrongdoing, and denying first amendment rights have been translated:

We do not doubt any of our personnel. Can you say the same? What happened with the $687,000 which the federal Department of Housing discovered had been lost and the report which you had asked the City Council to keep confidential?

. . . .

But there is also something which I cannot ignore and that is your order to municipal employees not to talk with the reporters of El Diario–La Prensa. That again brings back memories of Adolf Hitler or the censorship prevalent in totalitarian regimes like those of Fidel Castro.

*Id.* at 123.

We must now consider case law relevant to these utterances. In *Greenbelt Coop. Pub. Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), a newspaper cited a citizen's statement, made at a city council meeting, that the plaintiff, a local real estate developer, was "blackmailing" the city in connection with certain zoning variances. The Supreme Court determined that no libel had been committed inasmuch as there had been no false accusation of criminal conduct. The Court concluded that no reader of the newspaper could possibly have interpreted the report to mean that plaintiff was being charged with the crime of blackmail. "[E]ven the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable." *Id.* at 14, 90 S.Ct. at 1541, *see Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 508 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978). In *Kotlikoff,* the New Jersey Supreme Court concluded that statements in a letter to the editor published by a newspaper accusing plaintiff of involvement in a "huge cover-up" and a "conspiracy" were protected expressions of opinion. "When examined in their full context, the offending words appear to have been used *not* as specific accusations of criminal activity, but merely as pejorative rhetoric, criticizing plaintiff in an identified, isolated instance of his performance in public office." 444 A.2d at 1091.

We deem it significant that the editor based his statements upon facts that were fully disclosed in the open letter. In particular, the letter refers to the missing $687,000 in HUD funds and the directive to municipal employees not to speak with reporters of *El Diario.* The relevant aspect of the opinion dichotomy thus appears clear. There is a non-defamatory factual basis. Under New Jersey law, "[w]here an opinion is accompanied by its underlying non-defamatory factual basis, ... a defamation action will fail, no matter how unjustified, unreasonable or derogatory the opinion might be." *Kotlikoff,* 444 A.2d at 1091. Under such circumstances, readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified.

Accordingly, we believe that the contested paragraphs in the October 28th open letter are protected expressions of "pure" opinion. The editor's language was loose and figurative; it did not specifically accuse Mayor Dunn of criminal activity. The rhetoric employed by the editor to criticize Dunn's performance in public office cannot reasonably be interpreted as charging appellant with committing a criminal offense.

The open letter also compares Mayor Dunn with two notorious dictators. The first amendment invariably has been held to protect this comparison. *See, e.g., Koch v. Goldway,* 817 F.2d 507 (9th Cir.1987) (mayor's comments associating plaintiff with Nazi war criminal were political slurs in nature of opinion); *Buckley v. Littell,* 539 F.2d 882, 893–94 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) ("fascist" not defamatory). Such name calling, in the context of public debate, is protected speech because of the "profound national commitment that debate on public issues should be uninhibited, robust, and wide open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times,* 376 U.S. at 270, 84 S.Ct. at 720. The speech in the open letter can be

characterized as no more than "lusty and imaginative expression ... of contempt." *Letter Carriers v. Austin,* 418 U.S. 264, 286, 94 S.Ct. 2770, 2782, 41 L.Ed.2d 745 (1974).

We conclude that the district court did not err in granting summary judgment to defendants on that portion of the defamation action relating to the October 28th open letter.

### VII.

 After the court granted defendant's motions for summary judgment on the defamation claims, Dunn presented the district court with a motion for reconsideration. He requested an opportunity to supplement the record in the hope of providing evidence that would create an actual malice jury question. In denying the motion for reconsideration, the district court also denied Dunn's request to supplement the record. Dunn appeals from the court's denial of his request to supplement the record; we review the district court's action on an abuse of discretion standard. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331–32, 91 S.Ct. 795, 801–02, 28 L.Ed.2d 77 (1971).

Dunn's motion to amend the record was based on the timing of the Supreme Court's decision in *Anderson v. Liberty Lobby, Inc., supra,* which required him to oppose Gannett's summary judgment motions with clear and convincing evidence of actual malice. In denying Dunn's reconsideration motion, the district court noted that plaintiff previously filed a letter brief while defendant's motion for reconsideration was pending. This letter brief did discuss *Liberty Lobby,* but Dunn did not request an opportunity to supplement the record; instead, he merely stated that the record more than supported a finding of actual malice under a clear and convincing standard. *See* app. at 308.

Appellant points to no evidence that he claims to have withheld in reliance upon pre-*Liberty Lobby* law. Moreover, he was given at least one opportunity to address the impact of *Liberty Lobby* on his case. The district court properly rejected Dunn's

revised strategy, developed only after the court granted summary judgment in favor of Gannett: "Having had the opportunity to consider the ramifications of *Liberty Lobby* on his case and having concluded that there were none, plaintiff cannot now argue that he has been prejudiced." *Id.* at 308–09. We hold that the district court did not abuse its discretion by denying appellant's motion to supplement the record.

### VIII.

We will affirm the district court's grants of summary judgment in favor of defendant.