**SCHIAVONE CONSTRUCTION CO. and Ronald A. Schiavone, Individually, Appellants in 86–5839,**

**v.**

**TIME, INC., Appellants in 86–5920.**

**Nos. 86–5839, 86–5920.**

United States Court of Appeals, Third Circuit.

Argued Sept. 15, 1987.

Decided May 16, 1988.

Rehearing and Rehearing In Banc Denied June 10, 1988.

Theodore W. Geiser (argued), John F. Neary, Thomas S. Cosma, Connell, Foley & Geiser, Roseland, N.J., for Schiavone Const. Co., etc.

Peter G. Banta, Winne, Banta, Rizzi, Hetherington & Basralian, Hackensack, N.J., Stuart Robinowitz (argued), Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Time, Inc.

Before BECKER and SCIRICA, Circuit Judges, and FARNAN, District Judge\*.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal from the grant of summary judgment for defendant Time, Inc. in a highly publicized defamation case arising out of media coverage of an investigation of former United States Secretary of Labor Raymond Donovan. Plaintiffs, Ronald Schiavone (Schiavone) and Schiavone Construction Company (SCC), in which Schiavone owned a controlling interest and Donovan formerly owned a minority interest, brought a libel suit against Time on account of an article in *Time* magazine. The challenged portion of the article was based on a confidential memorandum of former FBI chief William Webster. Relying on the memorandum, the article asserted that "the name of Schiavone appeared several times in the bureau's reports on the 1975 disappearance of former Teamster Boss Jimmy Hoffa." In reporting on this confidential memo, the article did not, however, include the important statement that appeared in the memo that "none of these [appearances in the Hoffa execution files] suggested any criminality, or organized crime associations." Immediately following its report of the Webster memorandum, the article stated: "That detail would surely have intrigued both the Senate committee that approved Donovan's nomination in February 1981, and the special prosecutor this year."

Time asserts that the article focused on the Donovan investigation and that any incidental references to the plaintiffs merely recounted the plaintiffs' Mafia associations, which had been publicized countless times before. Plaintiffs, however, contend that the article does much more—that it purports to tie them to the notorious disappearance and suspected murder of Jimmy Hoffa. We consider in this opinion six interesting legal issues, at least two of which depend in some measure on whether the "sting" of the article concerns Mafia associations or innuendos of involvement with Jimmy Hoffa's disappearance. Several of these issues emerge from the murky ground where state (New Jersey) tort law ends and first amendment protection of the press begins. The "unhappy cohabitation" of the two competing values requires us to balance society's desire to protect an individual's good name and its interest in promoting the rights of a vigorous press. *Sisler v. Gannett Co.*, 104 N.J. 256, 516 A.2d 1083, 1086 (1986).

First, we consider the district court's holding that Schiavone and SCC are public figures. We conclude that even if plaintiffs did not intend to achieve limited purpose public figure status by their activities, they nevertheless did so by thrusting themselves into the forefront of the debate about Secretary of Labor Donovan. As a consequence of their status as public figures, they must, according to *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), prove with convincing clarity that Time acted with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280, 84 S.Ct. at 726.

Second, we consider the district court's summary judgment that plaintiffs are libel proof as a matter of law which resulted in the dismissal of the entire case against Time. Although we intimate no general view as to the viability of the libel proof plaintiff doctrine, we hold that under the facts of this case, depending on how a jury determines the sting of Time's article, the plaintiffs may indeed be able to secure compensatory damages and hence could not be libel proof as a matter of law. We expressly decline to consider the related question of plaintiffs' ability to secure punitive damages in the absence of compensatory damages, given the uncertainty that the jury will even have to reach this issue.

Third, we discuss the question whether the Time article is defamatory as a matter of law. We will reverse the district court's

\* Honorable Joseph J. Farnan, Jr., United States District Judge for the District of Delaware, sitting by designation.

partial summary judgment in favor of Schiavone on this issue. We believe that the assertion that the name of Schiavone appeared in the HOFFEX file is capable of non-defamatory as well as defamatory meaning and hence must go to the jury.

Fourth, after noting that plaintiff, as a matter of constitutional law, must prove the article's falsity, we address the question whether Schiavone deserves summary judgment on the question of the falsity of the article. We note that the determination of falsity depends in large part on the "sting" of the article, which, as we mentioned above, is a question for the jury. We nevertheless address the district court's determination that the name of Schiavone simply does not appear in the FBI files concerning Jimmy Hoffa's disappearance, and its grant of partial summary judgment for Schiavone on this issue. Although plaintiffs have presented affidavits from FBI agents who searched the files and found no reference to Schiavone, we nonetheless believe that the question is unripe for summary judgment at this juncture. We find persuasive Time's arguments concerning logistical problems in demonstrating that plaintiffs' names appear in the files to which Time has no access. We instruct the district court to allow Time the discovery it requested and then consider any motions for summary judgment on this specific issue.

Fifth, after explaining our grave doubts that New Jersey would apply its fair report privilege to an unauthorized leak of an internal FBI memorandum, and our observation that under New Jersey tort law the fair report privilege may be entirely subsumed by the malice inquiry, we ultimately conclude that, under the facts of this case, Time's report of the Webster memorandum was so inherently unfair that it has forfeited the privilege as a matter of law. We therefore affirm the grant of partial summary judgment for Schiavone on this issue.

Finally, we consider whether, under the facts, including the intentional deletion of exculpatory material from the Webster memorandum, the question of malice should go to the jury. Applying *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), we affirm the district court's denial of Time's motion for summary judgment on the question of malice. We hold that a reasonable jury could find by clear and convincing evidence that Time acted with *New York Times* actual malice.

We therefore affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

The following facts, except where noted, are undisputed.[1] On August 23, 1982, Time Magazine published an article about the reopening of Special Prosecutor Leon Silverman's investigation of Secretary of Labor Donovan. Donovan had been vice-president and a 38% shareholder of SCC. Donovan's association with Ronald Schiavone and with SCC formed the basis of many allegations of Donovan's connections with organized crime.

The article read in full:

### JURY STILL OUT

#### Donovan probe is reopened

Only seven weeks ago, when Special Prosecutor Leon Silverman released a 1,025–page report stating that there was "insufficient credible evidence" to prosecute the Labor Secretary, Raymond Donovan quickly declared that his troubles were over. Not quite. Silverman has reopened his investigation, and Time has learned that he will present fresh allegations about Donovan's conduct to grand juries in New York and elsewhere.

Phase II of the inquiry centers on the charge that Donovan, then part owner of New Jersey's Schiavone Construction Co., met near Miami in January 1979 with two known mobsters: William Masselli, a member of the Genovese Mafia

---

1. We rely heavily on the meticulous factual recitation provided by the district court. *Schiavone Constr. Co. v. Time, Inc.,* 619 F.Supp. 684 (D.N.J. 1985) (*Schiavone II*).

family and head of an excavation firm that did business with Schiavone; and Albert ("Chink") Facchiano, a convicted loan shark and former *capo* (captain) in the Genovese clan. The purpose of the Miami get-together was reportedly to set up no-show jobs for Genovese Mob members on Schiavone construction sites. Although Donovan refused to comment on the new inquiry, he has repeatedly denied meeting with any mobsters. He contends he had run into Masselli only about three times, always at job sites, and says he does not know Facchiano at all.

In the first probe, Silverman received so many reports about Donovan's alleged conferences with mobsters in Miami that Facchiano, one of several gangsters mentioned in the allegations, escaped any questioning. Almost all the others had denied knowing the Labor Secretary, and Silverman says that summoning Facchiano then seemed pointless. But Facchiano, who is serving time in an Alabama prison for loan sharking, will now be called to testify. Silverman will also attempt to interrogate two men closely connected with Masselli who were not questioned during the first probe: Joseph Verlezza, an associate of Genovese gangsters, and Alfred Ditraglia, who watches over Masselli's interests in the Miami area, including an oceanfront condominium. During the initial inquiry, Verlezza claimed he was too ill to testify; Ditraglia could not be found by Silverman's staff.

The FBI faces some tough questioning of its own. The Senate Labor Committee is investigating the bureau's handling of Donovan's confirmation probe 18 months ago. *The personal files of FBI Director William Webster, forwarded to the committee last month, reveal that the name of Schiavone appeared several times in the bureau's reports on the 1975 disappearance of former Teamster Boss Jimmy Hoffa. That detail would surely have intrigued both the Senate committee that approved Donovan's nomination in February 1981, and the special*

*prosecutor this year.* But neither learned about it until last month. (emphasis added).

Sandy Smith, author of the article and a veteran reporter for Time, based the last paragraph of the article on confidential information he received from three separate sources at the FBI. The sources informed him of a confidential memorandum by FBI Director Webster concerning the FBI's investigation of Donovan. Although Smith never actually saw a transcript of the Webster memorandum, he wrote it down word for word as it was read to him over the phone by a source within the FBI. As the following excerpt from the Webster memorandum demonstrates, Smith omitted from his article certain exculpatory language that appeared in the Webster memorandum itself. In discussing his inquiry into "Pat Donovan," Webster noted in the memorandum:

> I checked with Mr. Revell and based on information which he supplied, as well as my recollection of the conversation with Mr. Mullen ... that we had reviewed all our indices and had checked with all field offices and nothing negative had been disclosed [about Donovan]. I advised that a company, Chivone [sic] (PH), in which he apparently had a very substantial interest, had appeared a number of times in reports in our HOFEX [sic: HOFFEX (Hoffa execution)] case, *but that none of these suggested any criminality or organized crime associations.*

619 F.Supp. at 687 (emphasis added) (ellipses added).

Smith, at a deposition, admitted that he knew that the exculpatory language appeared in the Webster memorandum, but testified that he consciously chose to omit it from the article because he did not believe the disclaimer. Time focuses considerable attention on Smith's reasons for omitting the material. Smith cited confidential information that "totally contradicted" the other assertions in Webster's memorandum and hence discredited, in Smith's mind, Webster's exculpatory remarks. 619 F.Supp. at 688 (quoting from Smith's deposition). Smith knew, and presented evi-

dence of his knowledge, that Schiavone and SCC had been linked to organized crime in other FBI files, but that those appearances had been originally withheld from the Senate Committee investigating Donovan. Because the Webster memorandum was incorrect about the fact that nothing negative appeared about plaintiffs in the other FBI files, and because Smith knew from other sources that all field offices had not been checked, Smith doubted the veracity of Webster's other conclusions, including the exculpatory explanation of Schiavone's appearance in the HOFFEX files. In addition, Smith testified that he omitted the exculpatory phrase because he did not find it central to the thrust of the article and because it was ambiguous. *Id.* at 691.

Smith's three attempts to corroborate the existence of Schiavone's and SCC's names in the HOFFEX files independently were unsuccessful; all three confidential sources explained that such references were "missing," that "they could not be found," and that "nobody could find [them]." 619 F.Supp. at 689 (quoting from Smith's deposition).

Before publishing the article, Smith met with Special Prosecutor Leon Silverman, who had investigated charges against Donovan, to inform him that the name of Schiavone appeared in the HOFFEX files. *Id.* Silverman looked into the matter and on August 12, 1982, eleven days before the article was published, Silverman met with Smith to tell him that Schiavone and SCC in fact were not mentioned in the HOFFEX files. There is much dispute as to what Silverman said to Smith. The Assistant Special Counsel, Gregory N. Joseph, who also attended the meeting, claims that Silverman clearly informed Smith that the reference to Schiavone and SCC simply did not exist. Smith claims that Silverman informed him that "the Director [Webster] was in error," and that Smith understood the error to be the exculpatory language and not the existence of the reference itself. 619 F.Supp. at 690 (quoting from Smith's deposition).

Two days before the article was published, Mr. Mullen, executive assistant director of the FBI, who is mentioned by name in the FBI director's memorandum, testified before the committee concerning the appearance of the name of Schiavone in the HOFFEX file. Although Mullen testified that he knew no details concerning the appearance of Schiavone in the file, did not know who informed the director, and had not checked any references himself, he nevertheless lent credence to the existence of the memorandum. Furthermore, five weeks after the Time article appeared, FBI director Webster insisted that his own agents had supplied him with the information, saying "I know what they told me and now they can't find it. It's one of those things." 619 F.Supp. at 692.

Schiavone and SCC brought this libel action against Time in the district court for the District of New Jersey, on the basis of the last paragraph of Time's article. Time moved to dismiss, Fed.R.Civ.P. 12(b)(6), on the grounds that Time's article was protected by a fair report privilege. The district court granted the motion. *Schiavone Constr. Co. v. Time, Inc.,* 569 F.Supp. 614 (D.N.J.1983) (*Schiavone I*). This court reversed, holding that the complaint raised a factual question as to the fairness of the report that precluded granting such a motion. We remanded for development of a factual record. *Schiavone Constr. Co. v. Time, Inc.,* 735 F.2d 94 (3d Cir.1984). The district judge recused himself and the case was reassigned to Judge H. Lee Sarokin.

On October 1, 1985 Judge Sarokin issued the first of two opinions on the matter. In the first opinion, which we will call *Schiavone II,* he made five rulings relevant to this appeal. First, Judge Sarokin ruled that Schiavone and SCC were public figures. Second, he granted partial summary judgment for Schiavone because he concluded that, as a matter of law, Time could not assert a fair report privilege under New Jersey common law. Third, Judge Sarokin granted partial summary judgment for Schiavone on the question whether Time could assert a truth defense: he held, also as a matter of law, that since the references to Schiavone in the HOFFEX files never existed, Time could not assert such a defense. Fourth, Judge Sarokin

granted partial summary judgment for Schiavone on another issue, holding that Time's article was defamatory as a matter of law. Finally, he denied Time's summary judgment motion on the issue of Time's actual malice, holding that a genuine question of material fact remained for the jury on that issue. 619 F.Supp. at 684.[2]

On November 6, 1986 Judge Sarokin issued a second opinion, which we will call *Schiavone III*, holding as a matter of law that Schiavone was "libel proof"; *i.e.*, the reputations of Schiavone and SCC were so bad that Time's article could not further damage them. 646 F.Supp. 1511, 1516 (D.N.J.1986). Judge Sarokin also held that because plaintiffs could not obtain compensatory damages, they were not entitled to punitive damages, as a matter of federal constitutional law, even though New Jersey law would have permitted a punitive damage award. *Id.* at 1520. Judge Sarokin therefore granted summary judgment and dismissed plaintiffs' complaint.

Schiavone and SCC appeal from the final order in *Schiavone III* holding them libel proof and thereby dismissing their claims. They contend that the "sting" of the article is its insinuation that plaintiffs were involved in a notorious murder. They further contend that, in view of: (1) the omission of the exculpatory material (*i.e.*, the failure to report that none of the HOFFEX references suggested criminality); (2) the innuendo of criminality in the last sentence of the article; and (3) the fact that Schiavone and SCC have never before been identified as having been involved in such nasty business as the Hoffa execution, it cannot be said that they are libel proof. There is, they therefore say, an actionable claim for libel. Schiavone and SCC also appeal the

district court's determination in *Schiavone II* that they are public figures.

Time, of course, supports the district court on these last two points. On the other hand, Time has filed a cross-appeal from the district court's order accompanying *Schiavone II*, granting summary judgment to Schiavone on the issues of fair report privilege, the truth defense, defamation per se, and malice. Time notes, however, that given the district court's holding in *Schiavone III*, if we agree that Schiavone and SCC are libel proof, and that they are ineligible for nominal or punitive damages as well, these other questions become irrelevant and the cross appeal becomes moot.[3]

## II. ARE PLAINTIFFS PUBLIC FIGURES?

In *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26, the Supreme Court held that a public official may recover for libel only if "he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The plaintiff must prove malice with "convincing clarity," *i.e.*, by clear and convincing evidence.[4] *Id.* at 285–86, 84 S.Ct. at 728–29. The Court has extended this constitutional standard beyond public officials to include public figures. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967) (plurality opinion). It specifically refused, however, to extend the *New York Times* standard to private persons. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342–50, 94 S.Ct. 2997, 3008–12, 41

---

**2.** Judge Sarokin also ruled that the article was "of and concerning" Ronald A. Schiavone. *Schiavone II*, 619 F.Supp. at 695–96. Time does not raise this issue on appeal.

**3.** All parties and the three separate courts that have heard this case in various stages of litigation have applied New Jersey law. We have no reason to unsettle this agreement that New Jersey law applies. *See Schiavone Constr. Co. v. Time, Inc.*, 735 F.2d 94, 96 (3d Cir.1984) (reversing *Schiavone I* and noting that the panel had

"no cause *sua sponte* to challenge [the] choice of law" in this case).

**4.** *See Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1088 (3d Cir.) ("convincing clarity" standard "has been understood to mean that when a plaintiff has the burden of proving actual malice, he must do so by 'clear and convincing' evidence" (citations omitted)), *cert. denied*, 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985).

L.Ed.2d 789 (1974).[5]

The Supreme Court in *Gertz* offered general guidance as to how we should define the term public figure, identifying two types of public figures.[6] First, there are all-purpose public figures, such as politicians who have become household names. They "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009. The second and more common type of public figures are limited purpose public figures, who, although they are not well known throughout the country or on every issue, are nonetheless sufficiently involved in one particular arena to qualify as public figures

for that purpose.[7] Such limited purpose public figures have usually "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.*[8] The Court has also noted that, "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." *Id.; see Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 168, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979) (holding that plaintiff who refused to testify before a grand jury had not "engaged the attention of the public in an attempt to influence the resolution of the issues involved").

5. Under constitutional law principles, private persons who sue for libel must prove that the statement was false, if it involves a matter of public concern, but need not prove malice. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774, 106 S.Ct. 1558, 1562, 89 L.Ed.2d 783 (1986). Therefore, if we determined Schiavone and SCC to be private individuals, they would not have to show malice but only prove the falsity of the report. Even plaintiffs concede that the article raises issues of public concern and that they must prove it is false, for states may not impose liability without fault, even if the injured party is a private figure and does not involve a matter of public concern. *See Gertz*, 418 U.S. at 348, 94 S.Ct. at 3011.

We note that under a recent New Jersey Supreme Court case, *Sisler v. Gannett Co.*, 104 N.J. 256, 516 A.2d 1083 (1986), New Jersey has raised the standard of proof in libel cases for certain private figures on issues of public concern. *Id.* 516 A.2d at 1095. Although this case indicates that New Jersey would apply the standard that it describes as "akin to the 'actual malice' standard of *New York Times v. Sullivan*," 516 A.2d at 1093, it is not entirely clear that the standards are exactly the same. Furthermore, there is no indication that New Jersey would adopt the clear and convincing standard of proof required by *New York Times*. The *Sisler* case explains that " 'a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity.' " *Sisler*, 516 A.2d at 1093 (quoting *Dairy Stores, Inc. v. Sentinel Pub. Co.*, 104 N.J. 125, 516 A.2d 220, 232 (1986), making no mention of the clear and convincing standard); *see also* Note, *New Jersey Creates a New 'Semi-public Figure' in Defamation Actions: Sisler v. Gannett Co., Inc.*, 61 St. John's L.Rev. 143, 153 (1987) (noting that *Sisler* did not require clear and convincing standard). Given this potential difference between the two standards, we must address this constitutional question of whether plaintiffs are public figures.

6. In *Gertz* the Supreme Court emphasized that fashioning a constitutional standard for libel law requires courts to balance conflicting, cherished policies and that "[s]ome tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury." 418 U.S. at 342, 94 S.Ct. at 3008. Determining the status of the person being libeled is essential to achieving a fair balance between assuring a free press and protecting individuals from false defamatory statements. *Gertz* observed that in seeking this fair balance, it is reasonable to require public officials and public figures to meet a higher standard in proving libel because they have access to the media and are in a much better position to rebut untrue statements than private individuals would be. *Id.* at 344, 94 S.Ct. at 3009. Also, from the standpoint of individualized fairness, people in the public sphere who seek governmental office or public prominence "must accept certain necessary consequences of that involvement in public affairs." *Id.; see Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1079–82 (3d Cir.) (interpreting *Gertz*), *cert. denied*, 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985).

7. This court has held that corporations may be limited purpose public figures. *See Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir. 1980).

8. In *Gertz*, the Supreme Court held that the plaintiff was not a limited purpose public figure, because he "did not thrust himself into the vortex of the public issue, nor did he engage the public's attention in an attempt to influence its outcome." 418 U.S. at 352, 94 S.Ct. at 3013. *See also Time, Inc. v. Firestone*, 424 U.S. 448, 454–55, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976) (holding ex-wife of heir to tire manufacturing fortune not public figure, even though her divorce was publicized).

Twice recently this court has confronted the question of limited purpose public figure status and both times has held that the plaintiffs who had appeared frequently in the news could not escape limited public figure status. In *Marcone v. Penthouse International Magazine for Men*, 754 F.2d 1072, 1086 (3d Cir.), *cert. denied*, 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 477 (1985), we concluded that the plaintiff, an attorney who represented members of notorious (and infamous) motorcycle gangs, and who also was shown to have social contacts with their members, was a limited purpose public figure on the issue of his alleged participation in a drug conspiracy with those members. Although acknowledging that it was "a close case," the panel found that the plaintiff's underworld associations were "bound to attract attention and comment," *id.*, and observed that "[i]n the typical limited purpose public figure case, the plaintiff actively participates in the public issue in a manner intended to obtain attention." *Id.* at 1083. Furthermore, the panel held that if plaintiff's "actions [were] sufficient to transform him into a limited public figure, it is of no moment that Marcone did not desire such status." *Id.* at 1086.

Similarly in *McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir.1985), we held that an architect who had participated in numerous publicized and controversial building projects on St. Thomas, one of which he had (successfully) bid upon despite knowing its controversial nature, was a limited purpose public figure as to his participation in those projects, and that to prevail in a libel suit for allegedly false remarks about his professional competence as a builder and engineer, plaintiff had to prove malice. *Id.* at 949–50. We reiterated that the plaintiff could not escape public figure status simply because he wished not to be one.

*Id.* at 950 ("the voluntariness requirement may be satisfied even though an individual does not intend to attract attention" if he "undertakes a course of conduct that invites attention") (citing *Marcone* and *Rosanova v. Playboy Enterprises Inc.*, 580 F.2d 859 (5th Cir.1978)); *see Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 273–74 (3d Cir.1980).[9]

As we read *Gertz*, *Marcone* and *McDowell*, we must perform a case-by-case determination, scrutinizing the nature and scope of the plaintiffs' involvement in the controversy. As the *Gertz* Court instructed, "[i]t is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 U.S. at 352, 94 S.Ct. at 3013.

In *Schiavone II*, the district court did so and concluded that plaintiffs were public figures because: 1) they campaigned for President Reagan; 2) they conducted a private investigation of the Special Prosecutor and other investigators of Donovan; 3) they wrote numerous letters to the editor in various national and local publications complaining about the treatment of Donovan; 4) in their own promotional literature they bragged about their close ties with Donovan; and 5) SCC worked exclusively on public projects. 619 F.2d at 704–05.

Schiavone and SCC contend that their activities are insufficient to transform them into even limited purpose public figures. They argue that they never sought status as public figures and note that although *Gertz* mentioned the possibility of an involuntary limited purpose public figure, that status is rare. However, Schia-

**9.** We distinguish *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), where the Supreme Court ruled that a federally funded research scientist who received the "golden fleece award" from Senator Proxmire for wasting federal funds was not a public figure. The Court stressed that the scientist's fame came only after Proxmire's award. The Court cautioned against "bootstrapping" and noted that it could not permit the scientist's newfound fame, which was solely a result of the alleged libel, to trigger a malice requirement. 443 U.S. 134–135, 99 S.Ct. at 2687–2688. We find that *Hutchinson* does not apply because, unlike the plaintiff in that case, Schiavone and his company were not, before the *Time* article, unknown, unassuming figures who were thrust unwillingly into the public eye. *See McDowell*, 769 F.2d at 949 (distinguishing *Hutchinson* ).

vone's activities just described and the promotional brochure of SCC are plainly sufficient to categorize the plaintiffs as public figures under our jurisprudence.[10] Schiavone thrust himself into the controversy surrounding Donovan and his company by letter campaigns and his active investigation into the private lives of the committee members investigating Donovan.[11] Donovan, of course, was the U.S. Secretary of Labor, having been confirmed despite an avalanche of rumors of underworld ties, and so the underlying public controversy was a veritable vortex into which it was not difficult for Schiavone and SCC to be drawn.

The short of it is that Schiavone and SCC, like the plaintiffs in *Marcone* and *McDowell*, have, by their actions and associations, invited limited public figure status. Volumes of clippings concerning Donovan and his connections with the plaintiffs attest to the fact that questions concerning Schiavone and SCC were in the public eye long before Time's challenged article appeared. Schiavone's partnership with Donovan and Donovan's substantial interest in SCC enhanced the plaintiffs' status as public figures. We note, however, that not only plaintiffs' passive status as Donovan's partner, but their active participation in the controversy renders Schiavone and SCC limited purpose public figures. Finally, we observe, as did the district court, that Schiavone and SCC have obtained unusual exposure to the media. A high proportion of their letters to the editor have been published, and the editors of one New Jersey paper met with Schiavone concerning its coverage of the Donovan confirmation. Therefore, the justification for conferring the *New York Times* malice standard on public figures applies in full force. *See supra* note 6.

## III. THE LIBEL PROOF PLAINTIFF QUESTION

### A. Compensatory Damages

■ The libel proof plaintiff doctrine prohibits a plaintiff from recovering for libelous statements where the plaintiff's "reputation in the community was so tarnished before the publication that no further harm could have occurred." *Marcone*, 754 F.2d at 1078. To hold a plaintiff libel proof, the court must determine as a matter of law that the plaintiff would not be able to prove compensatory damages.[12] In *Schiavone III* the district court adopted Time's view that the "sting" of the article was not the Hoffa execution innuendo but the allegation that Schiavone and SCC were involved with the mob. It thereupon found that the tremendous publicity before the publication of the Time article concerning Schiavone and SCC's alleged mob connections rendered them libel proof as to allegation of Mafia association and corruption. The district court held that:

> In light of the hundreds of published reports tying Schiavone to organized crime, including the unchallenged state-

---

**10.** We agree with the district court that SCC's public contract work, standing alone, would not suffice to deem it a limited purpose public figure.

**11.** Schiavone misconstrues the notion of an involuntary public figure. As we have explained, the "voluntariness" of public figure status does not derive from a desire to be considered as such. Rather, the notion of voluntariness stems from performance of purposeful acts that propel an individual into a public controversy. In contrast, an involuntary public figure is passive and conducts no activities that could reasonably be held to invite public attention. For an example of a true involuntary public figure, *see Carson v. Allied News Co.*, 529 F.2d 206, 210 (7th Cir.1976) (wife of famous entertainer "more or less automatically becomes at least a part-time public figure herself") (dicta).

**12.** As the Court of Appeals for the Second Circuit, the pioneer of the libel proof plaintiff doctrine, has explained:

> [I]n those instances where an allegedly libelous statement cannot realistically cause impairment of reputation because the person's reputation is already so low or because the true portions of a statement have such damaging effects, even nominal damages are not to be awarded. Instead, the claim should be dismissed so that the costs of defending against the claim of libel, which can themselves impair vigorous freedom of expression, will be avoided.

*Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir.1986) (citation omitted), *cert. denied,* — U.S. ——, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987).

ments in the Time article itself reporting on Schiavone's underworld connections, Time argues that the challenged statement cannot further injure plaintiffs' reputation.

The court agrees.

*Schiavone III,* 646 F.Supp. at 1515–16.

Plaintiffs argue that the libel proof plaintiff doctrine is bad law.[13] They also contend that, even assuming that this court recognizes the doctrine, it cannot apply in this case because the plaintiffs have suffered compensable losses. Plaintiffs explain that the reason the district court found that they would not be able to demonstrate compensatory damages is that without giving any reasons it altered its theory of the case; in *Schiavone III,* the district court read the sting of the article to lie in Schiavone's mob associations, not plaintiffs' alleged connections with Hoffa's murder, as it had in *Schiavone II.*[14] Schiavone and SCC argue that they are not libel proof in view of the new and startling allegation in the last paragraph of the article implying their involvement with Hoffa's disappearance and that the jury could award them compensatory (including presumed) damages.[15]

Time argues that the district court, in *Schiavone III,* correctly assessed the sting of the article to be Mafia associations and that Schiavone and SCC are libel proof as to those allegations.[16] Furthermore, Time argues that in answers to interrogatories and at oral argument before the district court plaintiffs agreed that they could not seek compensatory damages. But as the district court notes in *Schiavone II,* so much conflict revolves around these alleged concessions that they cannot stand

---

**13.** They claim that: (1) courts only apply the libel proof plaintiff doctrine to criminals whose reputations could not be worse; (2) even the Court of Appeals for the Second Circuit, which created this doctrine, has cautioned that it should be used sparingly; (3) it is unfair to assume that they did not challenge the rest of Time's article or the numerous other reports about Schiavone and SCC because they were true. Rather, plaintiffs argue they had valid reasons, including limited resources and quality of evidence, for choosing to challenge only the last portion of the article, with no intention of conceding that the rest is true; and (4) recently courts have only applied this doctrine in cases where the challenged writing is substantially true in any case.

Time, on the other hand, agrees with the district court's handling of this issue in most respects. It cites this court's mention of the doctrine in *Marcone, see supra,* p. 1078 at 16–17, and notes that the doctrine is "not limited to plaintiffs with criminal records." *Guccione,* 800 F.2d at 303.

**14.** In *Schiavone II,* the district court indicated that the sting lay in the connection with Hoffa:

The statement at issue implies that Schiavone was involved in some manner in the disappearance of Jimmy Hoffa: to be linked to such notorious event most certainly implies criminality. Indeed, such was the perspective of TIME itself, which noted, in the context of an article discussing the organized crime connections of Schiavone principal Raymond Donovan, that the mention of Schiavone in the HOFEX [sic] files "would surely have intrigued" the Senate and Special Prosecutor Silverman. Of course, this intrigue would have been absent were there not an implica-

tion of criminality, or some other involvement, likely adversely to affect Schiavone's reputation.

*Schiavone II,* 619 F.Supp. at 695. In contrast, in *Schiavone III* the court wrote:

Plaintiffs, however, mischaracterize the challenged paragraph. A statement that Schiavone's name appeared in the FBI's Hoffa files is not an accusation of murder. The connection of Hoffa to organized crime is notorious. Schiavone's alleged involvement with underworld figures, as stated above, has been widely catalogued. The statement that Schiavone's name was in the Hoffa files—without specifying the nature of the references—does noting more than reassert the claims of Schiavone's ties with organized crime.

*Schiavone III,* 646 F.Supp. at 1516.

**15.** We express no view as to whether presumed damages would be available under New Jersey law. *See Sisler v. Gannett Co.,* 104 N.J. 256, 516 A.2d 1083, 1095–95 (1986).

**16.** Time also argues that the sting of the last, contested paragraph is no greater than the uncontested portions of the piece and that a reasonable reading of that last paragraph merely offers additional evidence of plaintiffs' close association with the mob. Additionally, Time cautions against reading the article in a "tortured" fashion to make it seem as if it says more than it really does. It cites *Church of Scientology v. Cazares,* 638 F.2d 1272, 1288 (5th Cir.1981), and *Tavoulareas v. Piro,* 817 F.2d 762, 781 (D.C. Cir.) (en banc), *cert. denied,* ⸺ U.S. ⸺, 108 S.Ct. 200, 98 L.Ed.2d 151 (1988), for the proposition that courts should not indulge in literary criticism or overread plain meanings in interpreting allegedly defamatory material.

alone to support the application of the libel proof plaintiff doctrine in this case. *Schiavone III*, 646 F.Supp. at 1515. The district court proceeded on the assumption that Schiavone and SCC would try to prove compensatory damages, but ultimately found that they would not be able to do so. Given the arguments before us, it is clear that the plaintiffs seek compensatory damages and, like the district court, we will consider that possibility.

This court was confronted with the libel proof plaintiff doctrine in *Marcone*. We did not rule affirmatively on the viability or wisdom of the doctrine, but simply refused to apply it to the facts of the case. 754 F.2d at 1079. We held that defendant introduced evidence that although plaintiff's "reputation was sullied before the article was published, we cannot say as a matter of law that Marcone was libel proof." *Id.* (citations omitted). Instead, the court observed that Marcone's allegedly tarnished reputation could be used as evidence to mitigate compensatory damages.

██ We will do what we did in *Marcone* and decline to rule on the libel proof plaintiff doctrine, concluding here as we did there that under the facts of the case, we cannot determine the plaintiffs to be libel proof. We agree with plaintiffs that a jury could find the sting of the article to lie in the connection with the Hoffa disappearance, *i.e.*, that it could find that the last paragraph of the article presents a new and distinct allegation that departs significantly from the rest of the piece and from allegations against the plaintiffs from other sources.

Although this is not the only possible interpretation of the sting, we believe that it is a reasonable one. While we find the district court's skepticism about the plaintiffs' ability to recover such damages per-

fectly understandable, nevertheless, we do not believe that it can be asserted as a matter of law that under every reasonable interpretation of the sting the plaintiffs would be unable to recover compensatory damages. If a jury were to find the sting to be the association with Hoffa's disappearance, then it might find that Schiavone and SCC had suffered actual or presumed damages. We hold then that the doctrine cannot apply.

### B. *Punitive Damages*

The district court also considered the question of the availability of nominal and punitive damages in the absence of compensatory damages (libel proof plaintiffs by definition can receive no compensatory damages). Although it believed that such damages were available under New Jersey law, the court ultimately concluded that federal constitutional law prohibits granting of punitive damages to a public figure where no compensatory damages exist.

Plaintiffs argue that the district court erred in its constitutional analysis and that New Jersey tort law controls. Plaintiffs argue that any contrary result would declare open season on libel proof plaintiffs. Unscrupulous media, they say, could report defamatory material with knowledge of its falsity and not be held accountable.

██ Time counters with policy arguments, emphasizing the importance of a free and vigorous press, and arguing that the availability of punitive damages against newspapers threatens the system of a free and fearless press that is essential to democracy.[17] Furthermore, it disputes the district court's interpretation of New Jersey law. We agree with the district court, however, that fairly read, New Jersey would permit a punitive damage award even where the plaintiff could only recover

---

17. Time also disagrees with the district court on the issue of whether it should have considered punitive damages at all. It argues that the court's holding on the libel proof plaintiff argument forecloses such an inquiry, and that any consideration of punitive damages would undermine the doctrine. It contends that logically, if the plaintiff is libel proof, his reputation has not been damaged, and he deserves no recovery at all. Because we have determined that the plaintiffs are not libel proof, and therefore that the question of damages must go to the jury, we need not confront the secondary issue posed by the libel proof plaintiff doctrine of whether plaintiffs, if they were found to be libel proof as a matter of law, could nevertheless seek punitive damages.

nominal damages for libel. *See Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224, 1229–31 (1984) (holding punitive damages available in absence of compensatory damages in action for legal fraud and citing libel actions as an example of the common law's willingness to allow punitive damages in certain actions without proof of compensatory damages); *see also Vassallo v. Bell,* 221 N.J. Super. 347, 534 A.2d 724, 738 (App.Div. 1987) (citing *Schiavone III* favorably on the question of the availability of punitive damages under New Jersey law).[18]

■ The breadth of the district court's constitutional discussion indicates that (notwithstanding New Jersey law) it would hold as a constitutional matter that no punitive damages were available to plaintiffs if the jury were to award nominal damages only. However, we will resist the invitation to play leapfrog in this constitutional minefield.[19]

We resist because any advice we could give on this issue would be contingent on the concatenation of many separate contingencies. First, the jury would have to find malice under the *New York Times* standard by clear and convincing evidence. *See*

*infra* section VII (discussion of malice). Second, the jury would have to find that Schiavone and SCC qualify for punitive damages under N.J.S.A. § 2A:43–2, an 1898 statute which requires that plaintiff either demand a retraction in writing or demonstrate that the defendant was motivated by malice in fact, ill-will or personal animus.[20] Third, the jury would have to find that despite Time's liability, Schiavone and SCC suffered no compensable injuries (including, at least in the case of Schiavone, presumed damages). Therefore, we believe at this juncture, the wisest course is to await the resolution of these various contingencies before confronting this thorny problem.[21]

## IV. WAS THE ARTICLE DEFAMATORY PER SE?

■ "[A]lthough replete with First Amendment implications, a defamation suit fundamentally is a state cause of action." *Jenkins v. KYW,* 829 F.2d 403, 405 (3d Cir.1987) (quoting *Marcone,* 754 F.2d at 1077). To determine whether Time's article was defamatory per se, that is, whether it was incapable as a matter of law of any non-defamatory meaning, we therefore

---

**18.** We express no opinion whether under New Jersey law plaintiffs could recover punitive damages against Time for the actions of its servant, Sandy Smith. *See infra* n. 34 (discussing respondeat superior).

**19.** Time cites *Linn v. United Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), for the proposition that "the defamed party must establish that he has suffered some sort of compensable harm as a prerequisite to recovery of additional punitive damages." *Id.* at 66, 86 S.Ct. at 664 (footnote omitted). We express no opinion as to how far this language extends beyond the facts of *Linn,* which was particularly concerned with balancing the rights of libel plaintiffs against the national labor policy in favor of vigorous debate in labor elections. We note that at least two other courts have allowed punitive awards where the plaintiffs received only nominal damages. *See, e.g., Buckley v. Littell,* 539 F.2d 882, 897 (2d Cir.), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 786, 50 L.Ed.2d 777 (1976); *Davis v. Schuchat,* 510 F.2d 731, 737–38 (D.C.Cir.1975).

**20.** The district court held that a jury could find malice in fact in this case and it therefore did not address the question of written request for retraction under N.J.S.A. § 2A:43–2. We note

that the common law malice in fact standard of New Jersey is, contrary to the district court's assertion, distinct from *New York Times* actual malice, and instead represents ill-will, or an " 'evil-minded act.' " *Nappe,* 477 A.2d at 1230 (quoting *DiGiovanni v. Pessel,* 55 N.J. 188, 260 A.2d 510, 513 (1970)); *see, e.g., Bock v. Plainfield Courier News,* 45 N.J.Super. 302, 132 A.2d 523, 528 (App.Div.1957). For the reasons set forth below, the case will have to be remanded. On remand, in addition to reconsidering the malice in fact standard, the district court may need to address the secondary issue of retraction.

**21.** If, on remand, the district court determines that punitive damages are appropriate, it may need to consider whether under New Jersey law a corporation needs to prove special damages in order to recover. *See, e.g., Molnar v. Star Ledger,* 193 N.J.Super. 12, 471 A.2d 1209, 1210 (App. Div.1984) (noting special damages suffered by corporation); *but see* Restatement (Second) of Torts § 561 comment a ("corporation may maintain an action for defamatory words that discredit it and tend to cause loss to it in the conduct of its business, without proof of special harm resulting to it").

must apply New Jersey law. Under New Jersey law "words that clearly 'sound to the disreputation' of an individual are defamatory on their face." *Lawrence v. Bauer Publishing & Printing Ltd.*, 89 N.J. 451, 446 A.2d 469, 473 (citation omitted), *cert. denied*, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982). Where the language can be interpreted in both a defamatory and nondefamatory manner, the question is one for the jury to decide. *Id; see also Marcone*, 754 F.2d at 1078. But where a statement is "not reasonably susceptible of a nondefamatory interpretation," the court may rule as a matter of law that the statement is defamatory per se. *Lawrence*, 446 A.2d at 473.

■ For example, in *Lawrence*, the New Jersey Supreme Court held that newspaper reports "that plaintiffs 'may be' charged with criminal conduct diminishe[d] their standing in the community." *Id.* The court therefore concluded that the statements in the articles were not susceptible of nondefamatory interpretation. *Id.; see Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446, 449 (3d Cir.1987) (quoting *Lawrence*). Similarly, in *Molnar v. Star–Ledger*, 193 N.J.Super. 12, 471 A.2d 1209, 1212 (App.Div.1984), the court held that an allegation that a landlord had refused to take a lie detector test concerning the loss of his building because of suspected arson was defamatory per se.

In applying New Jersey's standard, we cannot affirm the district court's decision in *Schiavone II* that Time's report was defamatory per se. Although there is evidence pointing to a defamatory interpretation of the information that the name of Schiavone appears in the HOFFEX files, this information could also be construed as non-defamatory. In the previous section we discussed two possible versions of the sting of the article. Nevertheless, we must also acknowledge that the assertion is capable of a non-defamatory meaning. For example, the appearance of Schiavone in the files could indicate knowledge of facts relevant to the investigation, or past associations with Hoffa (neither of which necessarily sound to the plaintiffs' disreputa-

tion). On the other hand, information that the name of Schiavone appeared in the HOFFEX files, coupled with the innuendo that the committee and the special prosecutor would have been intrigued, could clearly be read by the jury as defamatory. Therefore, a genuine issue of material fact exists as to this question and hence, it resides with the jury.

## V. TRUTH

The district court determined that the "truth" of Time's allegations revolved around the truth of the underlying information, *i.e.*, that the name of Schiavone appears in the HOFFEX files. The district court concluded, on the basis of statements by Special Prosecutor Leon Silverman and numerous affidavits from FBI agents, that the names of Schiavone and SCC do not so appear, hence that Time's assertion was false as a matter of law. *Schiavone II*, 617 F.2d at 701.

Before engaging the district court's conclusions and the parties' arguments, we must first delineate the appropriate burden of persuasion concerning the question of "truth" in a libel trial. In *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), a case decided after the district court's opinion in *Schiavone II*, the Supreme Court placed the burden of persuasion as to the veracity of the defamation squarely on the plaintiff. In discussing the burden of proving falsity by a private figure on an issue of public concern the Court noted that a "public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation." 475 U.S. at 775, 106 S.Ct. at 1563 (citing *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964)). Furthermore, any prior New Jersey caselaw to the contrary cannot override this constitutional rule.

■ Therefore, the question we must confront is whether Schiavone has proved the falsity of the defamatory statement so conclusively that, as a matter of law, no genuine question of material fact exists as to the report's falsity.

In so reviewing the district court's summary judgment, we once again are faced with the pervasive question of "sting." Even though we reject New Jersey's allocation of the burden of proof, we nevertheless believe, as the district court correctly noted, that, in considering the question of truth, " 'the truth must be as broad as the defamatory imputation or "sting" of the statement.' " *Schiavone II*, 619 F.Supp. at 700 (quoting *Lawrence*, 446 A.2d at 473). Therefore, the first question we must ask in determining whether Time's assertions are true is: what did Time say?

We perceive a range of possible answers. The "truth" to be perceived could be the existence *vel non* of the name Schiavone in mob files in general, the appearance of plaintiffs' names in the HOFFEX files in particular, plaintiffs' involvement with the mob, or their involvement with a notorious suspected murder. As we have stated above, a jury must resolve the question of the sting because reasonable persons could differ on that question. Obviously, if a jury were to find the sting to be centered on involvement in the Hoffa execution, the question whether Schiavone or SCC appears in the HOFFEX files would be crucial to establishing the falsity of Time's article. If, however, as Time argues, the sting is merely association with Mafia figures or appearance in the FBI files, the focus of the "truth" inquiry would be substantially different.[22]

█ The district court in *Schiavone II* held that the "truth" to be disproved was whether, as the article claims, "the name of Schiavone appears in the files on Jimmy Hoffa's disappearance." Time argues that even if this were the "truth" at issue, a genuine question of material fact exists as to the contents of the FBI report. It claims that the FBI affidavits asserting that plaintiffs' names do not appear in the HOFFEX files are self-serving and inherently unreliable.[23] Even though the ques-

tion of sting must still be resolved by a jury, we nevertheless address the summary judgment determination of the district court that the name Schiavone does not appear in the HOFFEX files. Obviously, the relevance of that information will depend entirely on the sting that the jury imputes to the article, but summary judgment on this question could at least narrow the issues.

█ In reaching its determination, the court relied on the affidavits of the FBI agents (requested by Time) and the disinterested views of Leon Silverman, all of which provide strong evidence that the names do not appear. For example, the affidavit of Paul Nolan, who has been employed as a Special Agent of the FBI since 1970, indicates that according to his "page-by-page" search of the HOFFEX files "[n]o references to 'Ronald A. Schiavone' or 'Schiavone Construction Company' appeared in the HOFFEX files." J.A. at 111a. Special Prosecutor Silverman faults the FBI for its disorganization and untimeliness, but ultimately concludes that the Webster memorandum was mistaken concerning the appearance of the names of Schiavone in the HOFFEX files. Fed.R. Civ.P. 56(e) requires that in opposing a motion for summary judgment a party must present "specific facts." Time's generalized allegation of the FBI's self-interest does not suffice to raise a genuine question of material fact. *See National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983) ("neither a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment"); *see generally*, Schwarzer, *Summary Judgment Under The Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 481 (1984). However, this case presents special circumstances that counsel that summary judgment is inappropriate at this stage in the

---

**22.** Time has presented evidence that Schiavone and SCC have appeared in other FBI Mafia files.

**23.** Time also cites to the honest belief of its reporter, Sandy Smith, that Schiavone's name appeared in the HOFFEX file. In making this

argument, however, Time confuses the question of truth with the question of malice. Smith's subjective belief is irrelevant to the actual veracity of the report.

proceedings, for Time may have faced unique impediments to its ability to assert its arguments concerning the contents of FBI files and the agents' credibility. Evidence exists that the FBI has, in the past, not been accurate or conscientious in its search of its files for the name of Schiavone.[24]

Because of the posture of this case, Time faces unusual difficulties countering Schiavone's assertions that the names of Schiavone and SCC do not appear in the HOF-FEX files. Under Fed.R.Civ.P. 56(f), summary judgment is not available "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2511 n. 5, 91 L.Ed.2d 202 (1986). Time has no access to FBI files and the district court never ruled on its discovery motions. Specifically, Time requests discovery from the FBI and wishes to depose the FBI agents who submitted affidavits, Webster, and Webster's subordinates who originally provided him with the information that the name of Schiavone appeared in the HOF-FEX files.

We are not necessarily persuaded that this question must ultimately go to the jury. Nevertheless, at this stage of the proceedings, without the additional discovery Time claims that it needs, we believe summary judgment is premature on this question. Therefore, we will reverse the district court on its judgment that as a matter of law the name Schiavone does not

appear in the FBI's HOFFEX files, with instructions to allow additional discovery as the court deems appropriate. If no additional information helpful to Time appears, partial summary judgment for Schiavone on this issue would then be appropriate. As to the broader question of truth, we will reverse and hold that this issue must go to the jury because the truth will depend on the jury's interpretation of the sting.

## VI. THE FAIR REPORT PRIVILEGE

Under New Jersey law the media enjoy a qualified fair report privilege. Reports shielded by the privilege are immune from a libel suit, even if the underlying substance of the report turns out to be false. The privilege was designed as an exception to the common law rule that reproduction of a defamation is tantamount to making the defamation oneself. The purpose of the privilege is to assure that people who report on official releases about public concerns will not be held responsible for the contents of the reports. *See generally* W. Prosser & W. Keeton, *Prosser & Keeton on the Law of Torts,* 835–37 (5th ed. 1984). A defendant forfeits this qualified privilege, however, if the report is inaccurate or unfair.[25] The common law privilege has been set out in § 611 of the Restatement (Second) of Torts, which New Jersey has largely adopted. *See Lavin v. New York News,* 757 F.2d 1416, 1419 (3d Cir.1985). The Restatement provides:

§ 611. Report of Official Proceeding or Public Meeting

---

**24.** In so observing we do not impugn the integrity or capability of the agents but simply note that the report of the Special Counsel of the Senate Committee on Labor and Human Resources found that "the FBI supplied information that was inaccurate, unclear, and too late. Worse, while the FBI told the Committee that there was nothing else to know, it withheld 'pertinent', 'significant', and 'important' information." Special Counsel of the Committee on Labor and Human Resources, United States Senate, 98th Cong., 1st Sess., Senate Print 98–26, *The Timeliness and Completeness of the Federal Bureau of Investigation's Disclosures to the United States Senate in the Confirmation of Labor Secretary Raymond J. Donovan,* 46 (Comm.Print 1983) (quotations in original).

**25.** This court has held that malice in fact (illwill) defeats the fair report privilege. *See Lavin v. New York News,* 757 F.2d 1416, 1421 (3d Cir.1985) (reaffirming prediction that "New Jersey courts would continue to apply the rule that the privilege is defeated by proof of actual intent to harm ('malice in fact')."); *Schiavone Constr. Co. v. Time, Inc.,* 735 F.2d 94, 97 (3d Cir.1984) (predicting that New Jersey Supreme Court would hold that fair report privilege is defeated if the report was "made solely for the purpose of causing harm to the person defamed") (quoting Restatement of Torts § 611 (1938)). Since that time, however, the New Jersey Supreme Court has indicated that actual malice will defeat the qualified privilege. *See Dairy Stores v. Sentinel Publishing Co.,* 104 N.J. 125, 516 A.2d 220, 232–33 (1986).

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Restatement (Second) of Torts § 611 (1977).

The parties devote their energies to arguing over whether the fair report privilege has been forfeited by Time's omission of the exculpatory part of the Webster memorandum. We must first note, however, the threshold question of whether the fair report privilege is even applicable under the circumstances of this case. We express serious doubt whether the Webster memorandum qualifies at all for the privilege.[26]

 We also note that a strong argument exists for the proposition that the fair report privilege essentially drops out of this case. We set out in the margin the argument that the protection Time desires in asserting the fair report privilege will emerge from the application of the constitutional malice requirement regardless of how we decide the fair report privilege issue.[27] However, we need not reach the

---

**26.** We are skeptical whether the unauthorized leak of a confidential FBI document qualifies as an "official action or proceeding" under the Restatement as interpreted by New Jersey law. The caselaw in New Jersey is sparse and what exists is far from clear on this point. New Jersey courts and this court in interpreting New Jersey law have emphasized the importance of open proceedings in affording the privilege. *See, e.g., Lavin,* 757 F.2d at 1419 (discussing the fair report privilege under New Jersey law extensively and noting that the case involved "an official, public, document"); *Swede v. Passaic Daily News,* 30 N.J. 320, 153 A.2d 36, 44 (1959) (emphasizing that "[t]he conclusion is inescapable that it was not only an official but also a public meeting"); *Barasch v. Soho Weekly News, Inc.,* 208 N.J.Super. 163, 505 A.2d 166, 175 (App. Div.1986) (describing the fair report privilege as a "qualified privilege to publish statements made by public bodies"); *but see Magrini v. Bergen Evening Record Corp.,* A–4063083T3 (Apr. 25, 1985) (not for publication opinion applying fair report privilege to leaked FBI documents).

This court addressed the question of the applicability of the fair report privilege to leaked FBI material in *Medico v. Time,* 643 F.2d 134, 137–46 (3d Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981), and determined that under Pennsylvania law the fair report privilege would attach to non-public government reports. Finding the Restatement inconclusive, *Medico* relied on Pennsylvania common law. It also stressed the broad policies of the privilege—to encourage the media to report on public affairs and to promote an informed public. We note that a leading secondary authority in the field of tort law, F. Harper, F. James & O. Gray, *The Law of Torts* (2d ed. 1986), criticizes *Medico* as "not in harmony with the mainstream of the common law." *Id.* § 5.24 at n. 33.

In expressing our serious doubts whether Time is eligible for a fair report privilege, we recognize the value of investigative reporting to a democracy, and the danger of chilling such a valuable watchdog and source of information. However, we believe that important countervail-

ing policy considerations raise serious issues concerning the appropriate application of the privilege to confidential FBI investigation files. The historical justification of the privilege, which operates as an exception to the general rule that one who republishes a defamation commits libel, is that the report is already in the public domain. *See* W. Prosser & W. Keeton, on the *Law of Torts,* § 115, at 836 (5th ed. 1984) ("[t]he privilege rests upon the idea that any member of the public, if he were present, might see and hear for himself, so that the reporter is merely a substitute for the public eye"); R. Smolla, *Law of Defamation* § 8.10[1], at 8–34 (1986) ("The rationale for the privilege is of considerable vintage, but remains as relevant as ever: The reporter is a surrogate for the public, permitting it to observe through the reporter's eyes how the business of government is being conducted.") (footnote omitted). Under the facts of this case, the Webster memorandum was not in the public sphere until Smith unearthed it and Time published it. By publishing such confidential documents about individual citizens, Time brought to light new and potentially defamatory information that the government had no intention of releasing—at least not in the form edited by Time. Such leaks could become powerful tools for injuring citizens with impunity. It is for these reasons that we seriously doubt that the privilege is applicable here.

**27.** There is strong indication, and Time itself concedes, that actual malice defeats the fair report privilege in New Jersey. Brief for Appellee/Cross–Appellant Time at 32 n. 20. *See Dairy Stores, Inc. v. Sentinel Publishing Co.,* 104 N.J. 125, 516 A.2d 220, 233 (1986) (holding that "to overcome a qualified or conditional privilege, a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity") (citation omitted). Although the case dealt with the qualified privilege of fair comment, the New Jersey Supreme Court discussed the question more generally, and encompassed all qualified privileges to libel. *See Fees v. Trow,* 105 N.J. 330,

question whether the privilege would apply or whether the privilege has become obsolete, because we agree with the district court that Time has forfeited the privilege as a matter of law.[28]

A plaintiff forfeits the privilege under New Jersey law if he exceeds the bounds of fair reporting. New Jersey libel law relies on the Restatement (Second) of Torts, both for a definition of the privilege

521 A.2d 824, 829 (1986) (recognizing that *Dairy Stores* appeared to encompass all qualified privileges but holding that the qualified privilege of an employee to report abuse of a disabled person represented an exception to the *general* rule that *New York Times* actual malice defeats a qualified privilege, and distinguishing in dicta the privilege to report abuse from areas in which actual malice would defeat the qualified privilege, such as "speech consequent on ... news and reporting discretion").

We note, however, that *Dairy Stores,* in holding that actual malice would defeat a qualified privilege, cited the *Restatement* (Second) § 600 for this proposition. This reference is enigmatic because that section of the Restatement specifically exempts the fair report privilege from the actual malice standard and would protect reports made with *New York Times* actual malice. *See also* Restatement (Second) of Torts § 611 comment a ("the privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false"). Although we often have stated that New Jersey follows the Restatement approach, it is clear, however, that New Jersey may depart from it. Given the most recent precedent from New Jersey, it seems reasonable to assume that New Jersey has rejected the Restatement's approach at least on this one point. Perhaps, however, New Jersey will limit its broad holding in *Dairy Stores,* and reject its dicta in *Trow,* and carve yet another exception to the broad rule it fashioned.

If New Jersey law would indeed provide that actual malice defeats the fair report privilege, the following syllogism indicates that the fair report privilege would be subsumed under the constitutional analysis: Should the jury find actual malice, then the fair report privilege would be forfeited under New Jersey law. If, on the other hand, the jury finds no malice, then under *New York Times,* Time is not liable because plaintiffs are public figures. Therefore, under any conceivable scenario, the fair report privilege would provide no independent protection. We hesitate to reach this ground-breaking conclusion without additional evidence of what the Supreme Court of New Jersey would actually do. We recognize how highly the state of New Jersey prizes freedom of the press. *See,*

and for an explanation of when the privilege is forfeited because a report is unfair. Section 611 of the Restatement provides that a report is privileged if it is "accurate and complete or a fair abridgement of the occurrence reported." Comment f explains:

> Not only must the report be accurate, but it must be fair. Even a report that is accurate so far as it goes may be so

*e.g., Sisler v. Gannett Co.,* 104 N.J. 256, 516 A.2d 1083, 1095 (1986) (extending the actual malice standard beyond constitutional requirements to include certain private figures on matters of public concern). Therefore, given the respect we owe to that court's jurisprudence and our uncertainty as to whether the New Jersey Supreme Court would intentionally deviate from the Restatement and hold that *New York Times* actual malice would defeat the fair report privilege, we will not base our holding on this point.

28. New Jersey has two other closely related potential sources of the privilege, but, on close analysis, neither applies. First, New Jersey has extended the common law doctrine to include "official statements issued by police department heads and county prosecutors in investigations in progress or completed by them." N.J.Stat. Ann. § 2A:43-1. In applying the statutory privilege to this case we note that no official statements were "issued," but rather confidential reports were leaked. Furthermore, the leaks were not made by the head of the FBI (an arguable analog to the police department head) but rather by some unknown subordinate. *Cf. Lawrence,* 446 A.2d at 474 n. 3 (dismissing in a footnote the possibility of a fair report privilege where a city official called a reporter privately to offer her information on some irregularities in a petition). We do not believe that confidential FBI files can fall within the limited scope of this privilege.

Second, New Jersey recognizes a "qualified privilege to report defamatory words or statements uttered by a public official with respect to matters within the scope of his official responsibility," which is "analogous to the privilege afforded the news media with respect to full, fair and accurate reports of judicial, legislative and other public proceedings." *Molnar v. Star-Ledger,* 193 N.J.Super. 12, 471 A.2d 1209, 1213 (App.Div.1984). This qualified privilege to report defamatory words or statements uttered by a public official with respect to matters within the scope of his responsibility is inapplicable because whoever leaked the report to Time was not acting within the scope of his office. *Cf. Molnar,* 471 A.2d 1212 (article reporting fire inspector's statement that a landlord refused to submit to a lie detector test regarding the arson of his building "was privileged because the com-

edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it. . . .

Restatement (Second) of Torts § 611 comment f (1977), *quoted in Lavin,* 757 F.2d at 1419 (*quoting Reilly v. Gillen,* 176 N.J.Super. 321, 328, 423 A.2d 311, 315 (App.Div. 1980)). The district court found that Time had forfeited its fair report privilege because its omission of the exculpatory language rendered the report incomplete and inherently unfair. *Schiavone II,* 619 F.2d at 699–700.

Time relies heavily on *Lavin,* arguing that the court did not suspend the fair report privilege because the thrust of the story—corruption and collusion with the mob—was a fair report. Time argues that the discrepancies between the original report and the actual article were far greater

in *Lavin* than in this case.[29] We disagree. We believe just the opposite is true—that the potential for unfairness and distortion is much greater in this case. The deletion of the exculpatory language altered considerably the fairness of the report and seems to fall squarely into Restatement (Second) § 611 comment f.

 The question for us now is whether as a matter of law the report was so unfair that the privilege has been forfeited. Time argues instead that the question must go to the jury.[30] We disagree.[31] We do so because we believe that Time's omission presents a clear example of an unfair report that does not deserve the qualified privilege to reproduce a libel. The last paragraph in Time's article combines selective quoting and innuendo to provide a very different message than the article would have conveyed had it included the exculpatory material.[32] Essentially, the added information that none of the references to Schiavone in the HOFFEX records connoted any criminality would have neutralized

plained of statement was obtained from a public official acting within the scope of his duties").

29. In *Lavin,* the panel discussed extensively the question of when New Jersey's fair report privilege will be forfeited. In that case a police officer claimed to have been libeled by an article about police corruption. The article reported on an FBI investigation of police ties to the Mafia in plaintiff's city. The article included a photograph of the plaintiff as well as the headline: "The Mob: Best Cops Money Can Buy." Plaintiff claimed that he never received bribes from the mob and hence that the report was inaccurate and unfair. This court, in holding that the report was essentially fair, explained that under New Jersey law "there can be no liability on the part of the defendants for republishing the contents of an official document, so long as their account is reasonably accurate and fair." 757 F.2d at 1420.

30. This inquiry presents the flip side of the issue that the previous panel considered upon reviewing *Schiavone I.* In *Schiavone I* the district court granted a 12(b)(6) motion in favor of the defendant on the grounds of the fair report privilege because it determined that the report was sufficiently fair that Schiavone had no claim upon which relief could be founded. This court reversed that judgment and noted that the

editorial addition [reference to Special Prosecutor and Senate Committee's being intrigued], especially when coupled with Time's

omission of the exculpatory language in the Webster memorandum, more than sufficiently creates a question of fact as to the fairness of Time's summarization of the Webster memorandum so as to preclude a determination by the district court that publication of the article was privileged as a matter of law.

735 F.2d at 98.

In holding that the report was unfair as a matter of law, we do not act inconsistently with our decision reversing *Schiavone I.* Time argues that the differing conclusion of the two district judges in *Schiavone I* and *Schiavone II* indicates, if nothing else, that reasonable people could disagree as to whether the report was fair. We note, however, that the district court in *Schiavone II* possessed more information when it made its summary judgment ruling than the *Schiavone I* court had in granting Time's 12(b)(6) motion.

31. As we noted in *Lavin,* § 619 of the Restatement indicates that abuse of a qualified privilege is normally a jury question, "unless the facts are such that only one conclusion can reasonably be drawn." Restatement (Second) of Torts § 619(2) comment b; *see Lavin,* 757 F.2d at 1419.

32. We believe that this holding is consistent with our observation that the question of the sting and the truth of the article must be made by the jury. *See supra* sections III, V. Under any version of the sting, the exculpatory materi-

the last paragraph. Without the exculpatory clause the message, however, is quite different. We find this case very much like the facts of *Reilly*, where the court relied on Restatement § 611 comment f. *See Reilly v. Gillen*, 176 N.J.Super. 321, 423 A.2d 311, 315 (App.Div.1980). In that case a political candidate reported that an opponent was accused of wrongdoing, but neglected to note that all allegations were voluntarily dismissed and the accused was exonerated. 423 A.2d at 313. The court found that the privilege was forfeited there, *id.* at 315, and we believe that that precedent controls here. A report that intentionally excludes information that is as obviously exculpatory as the information Sandy Smith elected to delete simply cannot, under any definition, be deemed either fair or accurate. We therefore affirm the grant of partial summary judgment for Schiavone on the fair report privilege issue.

## VII. MALICE

The district court found the question whether Time acted with *New York Times* actual malice to be appropriate for jury consideration and therefore refused to grant Time's summary judgment motion on that issue. We agree.

In *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court addressed the question of when summary judgment should be available for defendants in libel suits on the question of malice. The Court explained that in determining whether a genuine factual issue exists as to actual malice the district court "must bear in mind the actual quantum and quality of proof necessary to support liability under *New York*

*Times.*" 106 S.Ct. at 2513. "[T]he appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Id.* at 2514 (footnote omitted);[33] *see Jenkins v. KYW*, 829 F.2d 403, 405 (3d Cir.1987) (quoting *Liberty Lobby*).

■ We must first describe the *New York Times* actual malice standard.[34] The Supreme Court has defined actual malice as "knowledge that [a statement] was false or ... reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280, 84 S.Ct. at 726. The standard is a subjective one, based on the defendant's actual state of mind, and the Supreme Court has cautioned that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). As we explained in *McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir.1985), "reckless disregard for the truth means that the defendant 'in fact entertained serious doubts as to the truth' of the statement, [*St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325,] or that the defendant had a 'subjective awareness of probable falsity.' [*Gertz*, 418 U.S. at 335 n. 6, 94 S.Ct. at 3044 n. 6.]" *Id.* at 951.

■ A plaintiff may "rarely be successful in proving awareness of falsehood from the mouth of the defendant himself." *Herbert v. Lando*, 441 U.S. 153, 170, 99 S.Ct. 1635, 1645, 60 L.Ed.2d 115 (1979). A de-

al would have made the statements more benign and, as even plaintiffs admit, incapable of defamatory meaning.

**33.** In *Liberty Lobby* the Supreme Court held that the Court of Appeals for the D.C. Circuit employed the wrong standard when it rejected Anderson's motion for summary judgment on the question of malice. The court of appeals had applied the *New York Times* actual malice standard, but did not do so by clear and convincing evidence. The Supreme Court did not express its opinion as to whether the behavior of the defendant in the case could meet this yet

higher burden, but instead vacated the decision and remanded the case.

We note that although the Supreme Court decided *Liberty Lobby* after the district court issued its summary judgment on malice in *Schiavone II*, the district court presaged the Supreme Court's holding and applied the correct test in this case.

**34.** Because Sandy Smith was an employee of Time, Time is responsible for Smith's actual malice under a theory of respondeat superior. *See Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 253–54, 95 S.Ct. 465, 470–71, 42 L.Ed.

fendant subject to the actual malice standard "cannot, however, ... automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326. Therefore, objective circumstantial evidence can suffice to demonstrate actual malice.[35] Such circumstantial evidence can override defendants' protestations of good faith and honest belief that the report was true. *Id.*[36]

▪ Although the Supreme Court has cautioned that reckless disregard "cannot be fully encompassed in one infallible definition," and that "[i]nevitably its outer limits will be marked out through case-by-case adjudication," *id.* at 730, 88 S.Ct. at 1325, we can delineate some boundaries. Mere evidence that a media defendant did not investigate properly does not rise to the level of actual malice. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 153–54, 87 S.Ct. 1975, 1990–91, 18 L.Ed.2d 1094 (1967) (plurality opinion); *New York Times*, 376 U.S. at 287, 84 S.Ct. at 729; *McDowell*, 769 F.2d at 951. Obviously, actual malice cannot be imputed merely because the information turns out to be false. An erroneous interpretation of the facts does not meet the standard. *See Time v. Pape*, 401 U.S. 279, 292, 91 S.Ct. 633, 640, 28 L.Ed.2d 45 (1971) ("it is essential that the First Amendment protect some erroneous publications as well as true ones") (quoting *St. Amant v. Thompson*, 390 U.S. at 732, 88 S.Ct. at 1326).

However, the actual malice test could be met if the defendant had "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*,

390 U.S. at 732, 88 S.Ct. at 1326 (footnote omitted). Where the defendant finds internal inconsistencies or apparently reliable information that contradicts its libelous assertions, but nevertheless publishes those statements anyway, the *New York Times* actual malice test can be met. *Curtis Publishing Co. v. Butts*, 388 U.S. at 161 n. 23, 87 S.Ct. at 1995 n. 23 (1967) (plurality opinion); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1070 (5th Cir.1987) (citing *Curtis* and other cases). Neither does an erroneous interpretation of the facts meet the standard. *See Time v. Pape*, 401 U.S. 279, 290, 91 S.Ct. 633, 639, 28 L.Ed.2d 45 (1971).

Our challenge here is to apply the *New York Times* standard by clear and convincing evidence—through the "prism" of summary judgment. *Liberty Lobby*, 106 S.Ct. at 2513. Even though the standard for actual malice is difficult to meet, and even though it must be met by clear and convincing evidence, we nonetheless must not lose sight of the fact that we decide this question on summary judgment. On summary judgment, "[t]he non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). This requirement that we draw all inferences in favor of the non-movant is not inconsistent with the letter or spirit of *New York Times* actual malice determinations. As the Supreme Court explained in *Liberty Lobby*:

Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judg-

2d 419 (1974); R. Smolla, *Law of Defamation* § 3.36 (1986).

**35.** To make this point, Professor Smolla quotes the Court of Appeals for the First Circuit:

The subjective determination of whether [a defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts.... A court typically will infer actual malice from objective facts.... These facts should provide evidence of negligence, motive, and intent such

that an accumulation of the evidence and appropriate inferences supports the existence of actual malice.
*Bose Corp. v. Consumers Union of United States*, 692 F.2d 189, 196 (1st Cir.1982), *aff'd*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), *quoted in* Smolla, *Law of Defamation* § 3.14[2] at 3–38 (1986).

**36.** *See* R. Smolla, *Law of Defamation* § 3.14[2], at 3–37 to 3–38 ("*St. Amant* explicitly permits, and even encourages, the introduction of objective evidence for the light it sheds on the defendant's mental state.").

ment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

*Liberty Lobby,* 106 S.Ct. at 2513–14 (citations omitted).

Therefore, on summary judgment we may, as a jury might, discount Time's assertions of subjective belief in the truth of the article. Furthermore, consistent with our posture in reviewing this case on summary judgment, we may discount Time's arguments based on Sandy Smith's good faith in disbelieving the exculpatory clause and hence, omitting it.[37] Although we are certainly unwilling to predict a jury's ultimate disposition of this case, marshalling all the arguments on behalf of the plaintiffs and drawing all inferences in their favor, we hold that twelve reasonable people could find by clear and convincing evidence that Time acted with actual malice.

We have already determined that a jury could find the sting of the article to be the connection with Hoffa's disappearance and suspected murder. If a jury found that plaintiffs had proved the falsity of that sting, then it would turn to the question of malice. We present three reasons for our belief that a jury could find by clear and convincing evidence that Time's article was not only false but published with *New York Times* actual malice.[38]

First, four independent sources with good bases for knowledge contradicted the assertion that the plaintiffs' names appeared in the HOFFEX files. By Smith's own testimony, three separate attempts to check the presence of the names failed. Although there is some debate as to what happened in the meeting with Silverman, drawing all inferences in favor of the plaintiffs, we conclude that a jury could find that even the Special Prosecutor warned Smith that those references did not appear prior to publication.

Furthermore, this contradictory evidence came from highly reliable sources. The three individuals within the FBI whom Sandy Smith called had access to the HOFFEX files. They specifically checked for references to the plaintiffs and found none. Moreover, Special Prosecutor Silverman investigated the allegation after meeting with Smith and concluded that the memo was in error—the names of Schiavone and SCC did not appear in the HOFFEX files—

---

**37.** *But see infra* at 1092–1093 for a discussion of possible scenarios under which the jury would not find malice.

**38.** Time contends that the only issue bearing on the malice determination is whether the omission of the exculpatory clause was a reasonable interpretation of the Webster memorandum, and that this court cannot hold Time accountable for the assertions in the report even if the report was made with *New York Times* actual malice. We disagree. As we discuss *supra* in Section VI, Time has forfeited its fair report privilege. Therefore, Time cannot hide behind the fact that it was citing a report if it made that report with knowledge of falsity or reckless disregard of the truth or falsity. *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), is not to the contrary. In *Pape* the Supreme Court held that the defendant in that case had not acted with malice by omitting the word "alleged" in describing a Congressional

Committee's report on police brutality. Obviously, many of the factors that will affect the jury's deliberation as to malice will mirror the factors that it would have considered under a fair report privilege. Time mistakenly characterizes *Pape,* however, as a constitutional fair report privilege case. Although the court in *Pape* relied on the inherent fairness of the report in reaching its conclusion that the defendant had acted without malice, it in no way constitutionalized the fair report thereby insulating all reports of newsworthy events. *See Dickey v. CBS,* 583 F.2d 1221, 1226 (3d Cir.1978) (rejecting the argument that *Pape* created a constitutional fair report privilege protecting accurate reports published with malice); Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report,* 54 N.Y. U.L.Rev. 469, 501–08 (1979) (subsection discussing the "misconstruction of *Time, Inc. v. Pape* as a Decision Recognizing a Report Privilege").

and so informed Smith. Based upon these four sources, a jury could find clear and convincing evidence that Time published the article "despite the publisher's awareness of probable falsity." *Curtis*, 388 U.S. at 153, 87 S.Ct. at 1991.[39]

Second, a jury could find that Smith's explanation of why he deleted the exculpatory clause created additional clear and convincing evidence of malice. Smith claimed that he deleted the exculpatory clause because he did not believe it. As support for his deletion of the clause he cited other errors in the Webster memorandum. Smith noted, for instance, that the Webster memorandum claimed that all regional indices had been checked, yet Smith had independent knowledge that the name of Schiavone did appear in other FBI regional files. Given the other errors, Smith decided to omit the exculpatory clause that he did not believe. This explanation, however, would only provide evidence that Smith actually knew that the Webster memorandum was unreliable. In such event, his choice to credit only the portions that were damaging to Schiavone and not the portion that would have neutralized those damaging statements bears on his subjective state of mind and may point to actual malice.

Third, Smith's decision to simply delete language that cast a very different and more benign light on the facts he reported, could itself serve as a basis for a jury's finding by clear and convincing evidence that Time acted with knowledge of probable falsity. Even assuming that a jury were to find that Time lacked actual malice in reporting that the name of Schiavone appeared in the HOFFEX files, the jury could nevertheless find by clear and convincing evidence that Time acted with actual malice based on its deletion of the exculpatory clause and its insinuation that the appearance of Schiavone and SCC in the HOFFEX files would have "intrigued" the Senate Committee and Special Prosecutor. The jury could find that Time's alteration

implicitly recognized that the story would not "intrigue" its readers without this significant falsification. It could believe that Time recognized the damning implications, and emphasized them by omitting the exculpatory clause and adding editorial comment to draw attention. In other words, the jury could find clear and convincing evidence that Time's omission of the exculpatory clause significantly altered the message of the memorandum, that Time knew its implication was false, and that Time intended that false implication.

In making these observations concerning what a jury *could* find on the actual malice question, we in no way intimate what we believe the correct resolution of this question should be. Rather, in our limited posture of ruling on the district court's denial of Time's summary judgment motion, we hold that the district court did not commit legal error by allowing the claim to go to the jury. In setting out the argument we outlined the possible scenario by which a jury could find by clear and convincing evidence that Time acted with actual malice. We observe, however, that there are reasonable interpretations of the evidence, suggested by Time, that would preclude such a finding.

For instance, the jury could believe that Smith decided in good faith to print the article without the exculpatory clause because he knew of evidence in other FBI files that directly contradicted the notion that none of the appearances of Schiavone in FBI files connoted criminality. Additionally, the jury could believe that Smith believed the FBI was engaging in a cover-up, and assertions that the references "could not be found" were not credible in light of the memo itself. Indeed, Mullen testified two days before the article was published that he was informed of these references, and even five weeks after the article appeared, FBI director Webster insisted that his own agents had supplied him with the information, saying "I know what they told

---

**39.** Indeed, this case presents facts even more compelling than *Curtis* because in *Curtis* the plaintiff (who had an obvious personal interest) warned the newspaper of the falsity of its report before publication. In this case, uninvolved and unbiased parties searched and warned that they could not verify the information.

me and now they can't find it. It's one of those things." Finally, a jury could believe that the focus of the article was on Donovan and that the omitted exculpatory clause applied to him, not Schiavone.

Despite the reasonableness of these conjectures, all of which would indicate that Time would prevail on the question of actual malice, we believe that considering all the arguments mustered in favor of Schiavone above, a sufficient basis exists for a jury to find by clear and convincing evidence that Time acted with actual malice.[40] We therefore affirm the district court's denial of Time's motion for summary judgment on the malice issue.

## VIII. CONCLUSION

For the foregoing reasons we will affirm the district court's partial summary judgments establishing that (1) plaintiffs are public figures; and (2) Time forfeited the fair report privilege. We will also affirm the district court denial of Time's motion for summary judgment on the question of malice.

We will reverse the district court's case-dispositive summary judgment that plaintiffs are libel proof as a matter of law. We will reverse the district court's partial summary judgment that the contested part of the article was defamatory per se, because the jury could interpret the statement in either a defamatory or non-defamatory way. Additionally, we will reverse the district court's partial summary judgment determination as to truth. We hold that the question of truth is one for the jury because the truth depends heavily on the sting, which is itself a question for the

jury. Finally, we will reverse the district court's partial summary judgment as to the appearance of the name Schiavone in the HOFFEX files because on the current state of the record Time deserves additional discovery on that issue. We thus will affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

---

**40.** The facts of this case are distinguishable from recent post-*Liberty Lobby* caselaw in this court. In *Jenkins v. KYW*, 829 F.2d 403 (3d Cir.1987), this court held that defendants were entitled to summary judgment on the question of malice because no clear and convincing evidence pointed to the television station's knowledge or reckless disregard of falsity. Indeed, the court found that plaintiffs had failed to prove falsity and further that what they principally objected to were opinions, clearly protected by the First Amendment. 829 F.2d at 407.

Similarly, this case is distinguishable from *Dunn v. Gannett New York Newspapers*, 833

F.2d 446 (3d Cir.1987). In *Dunn* this court found that a Spanish language newspaper's use in a headline of the word "cerdos," which literally translates as "pigs" but which also connotes "litterbugs," did not libel the mayor whose speech was being characterized. The court held that the headline which translated literally into English read: "Calls Hispanics 'Pigs,'" *id.* at 448, may have mischaracterized the mayor's speech but any such error did not rise to the level of the *New York Times* actual malice standard. 833 F.2d at 452. The facts in this case are much more strongly in favor of the plaintiffs than those in *Jenkins* or *Dunn*.